MARY P. MARYE v. JOHN T. DYCHE, GATES, GILLESPIE & CO.

1. LANDLORD AND TENANT : COMMON LAW AND STATUTORY REMEDY FOR RENT DUE AND IN ARREAR. — The common law respecting distress for rent has been changed by our statute, which provides for a seizure of the *tenant's property* under a writ of attachment, and a sale of the same to satisfy the rent.

2. LANDLORD'S LIEN : TENANT MAY SELL OR INCUMBER PROPERTY ON DEMISED PREMISES. — The landlord has not *per se* a lien for rent on the goods and chattels of his tenant on the demised premises, and previous to a seizure under an attachment for rent, the tenant may sell or incumber the same, notwithstanding the existence of the claim for rent.

3. SAME : CASE IN JUDGMENT. — Marye leased a plantation for the year 1867 to Wadlington & Dyche. After the lease, Gates, Gillespie & Co. and John T. Dyche advanced money and supplies to Wadlington & Dyche, and secured the same by a mortgage and agricultural lien on the growing crops and stock on the leased premises. After the execution of the mortgage and lien, Marye sued out an attachment for rent, and seized the crops and stock. *Held* — That the mortgage and lien of Gates, Gillespie & Co. and John T. Dyche were entitled to preference and priority over the claim for rent.

4. SAME : AS AGAINST JUDGMENT CREDITORS. — By statute, judgment creditors are prohibited from taking the goods and chattels on demised premises by virtue of any writ of *fieri facias*, unless the party so taking the same shall, before the removal of the goods and chattels, pay or tender to the landlord the amount of one year's rent of the premises. Rev. Code, 531, art. 288.

5. CHANCERY PLEADING : DEMURRER TO BILL. — If a demurrer is applied to the whole bill, when it is good to a part only, it will be overruled; for it is a general rule, that a demurrer cannot be good as to a part which it covers, and bad as to the rest, and therefore it must stand or fall all together. Story's Equity Pleading, § 443.

APPEAL from the Chancery Court of Sunflower county. Hon. Wm. Cothran, chancellor.

Wadlington & Dyche leased from Mrs. M. P. Marye, appellant, for the year 1867, a plantation in Sunflower county. In May, 1867, Wadlington & Dyche executed a mortgage to Gates, Gillespie & Co. upon their crops of every species to be

raised on the Marye place, and upon their mules and stock, to secure the grantees in an advance of $3500 then made, and to enable the grantors to cultivate their plantation. The mortgage provides that the grantors were to have possession of the mortgaged property, and that if they failed by the 1st of December, 1867, to pay off the debt, the grantees were empowered to take possession of the property, sell, and apply the proceeds to the payment of the claim secured. The mortgage was recorded in the Probate Clerk's office in September, 1867.

John T. Dyche advanced during the year 1867, to Wadlington & Dyche, supplies for their plantation amounting to $5000, and took from them the following instrument:

"$5000. GREENWOOD, Nov. 3, 1867.

"One day after date, we promise to pay John T. Dyche or order five thousand dollars, for necessary supplies furnished us on the Marye place in Sunflower county the present year; to secure the payment of which, we hereby agree to make this instrument a lien under an act of the legislature of the State of Mississippi, approved 18th February, 1867, for encouragement of agriculture.

"WADLINGTON & DYCHE."

This instrument was enrolled and filed in Circuit Clerk's office of Sunflower county on the 12th of December, 1867.

On the 16th of December, 1867, Mary P. Marye sued out an attachment for rent due and in arrear, for the sum of $3600, and the same was levied on the crops of corn and cotton, and five mules and a wagon, found on the demised premises.

Gates, Gillespie & Co. and John T. Dyche filed their bill of complaint, stating the foregoing facts, and that the property levied on was that conveyed in the mortgage to Gates, Gillespie & Co., and upon which John T. Dyche had a lien under the act of the legislature for the encouragement of agriculture. That the balance due Gates, Gillespie & Co. is $1200, and the amount due John T. Dyche $5000. That the five mules and wagon levied on were not the property of Wadlington & Dyche,

but of John T. Dyche, who, early in 1867, agreed with said Wadlington & Dyche that they might have the use of the same for the year 1867, and were to return them at the close of the year, and in the event of their loss or destruction were to account for the same; for the mules at $500, and the wagon at $100.

The bill prayed for process for Mary P. Marye and Eli Waites, sheriff of Sunflower county (who had levied the attachment for rent), and for a writ of sequestration; also, that the liens of Gates, Gillespie & Co. and John T. Dyche upon the crops be held as paramount to all others, and the same enforced by a sale according to law; that John T. Dyche be entitled to the five mules and wagon as his property, or that he have a lien on the same above all others.

A writ of sequestration issued, the property was seized and the same delivered to Mary P. Marye upon her executing bond, with security, in double the value.

To the bill of complaint a demurrer was filed, and the following causes of demurrer assigned:

1. Because the claim of defendant, appellant in this court, for one year's rent was superior and paramount to that of Gates, Gillespie & Co. and John T. Dyche.

2. Because, as to the mules and wagon, the same became the property of Wadlington & Dyche, and being on the plantation leased by defendant to said Wadlington & Dyche, became liable to pay the year's rent in preference to the claims of complainants.

3. Because John T. Dyche for the recovery of the mules and wagon has a full and complete remedy at law.

4. Because complainants do not offer, nor does it appear they have offered, to pay defendant the whole or any part of the rent for the year 1867.

5. Because it does not appear that the claims of complainants were enrolled and filed in the Circuit Clerk's office of Sunflower county before the levy of the attachment for rent.

6. Because complainants are not entitled to the relief prayed for.

The demurrer was overruled, and from this decree de-

fendant in the court below prayed an appeal to the High Court of Errors and Appeals, which was granted.

*Thomas Walton* for appellant.

The case of *Canterbury* v. *Jordan*, 5 Cushman, 96, settles the right of the landlord to prior payment out of the tenant's goods. This was a case where a common attachment and a distress warrant were both levied at the same time, and the court held that the distress warrant was entitled to prior satisfaction. This must have been on the ground of the landlord's superior claim over all other creditors; because but for this superior right the lien of the distress for rent and the common attachment would have been equal, and they would have been paid off *pari passu*, as they were levied at the same time. It was objected to this case in the court below, that the syllabus was the only place where the facts are reported; but it is here submitted that this objection is frivolous, and that the case, except upon reference to the syllabus, shows no authority whatsoever for the judgment of the court ordering the rent to be first paid, and that no other ground can be assigned for this direction than the landlord's superior rights. Indeed, it is said in the case that the law makes the tenant's property first liable for the rent.

Taylor's Landlord and Tenant, § 659, says that "the rent seems to be a trust or charge upon the estate; and the lessee is bound, at least in conscience, not to take the profits without a due discharge of the rents out of them." *Vide* Fonbl. Eq. B. 1, C. 5, § 5; *Goddard* v. *Keates*, 1 Vern. 27; 1 Story's Eq. Ju. § 687.

The cases of *Hazard* v. *Raymond*, 2 John. 478, and *Trappan* v. *Morie*, 18 John. 1, both establish that rent accruing before execution levied is entitled to payment before the execution; and in *Trappan* v. *Morie* the court say the landlord has a "lien" for the rent due previous to the levy of the execution. "Rent is a lien upon the tenant's goods," says Taylor. (Landlord and Tenant, § 577), "so long as they remain upon the demised premises, and at common law the right was gone the moment they were removed, for the landlord had parted with his lien; possession, or what is equivalent to possession, being necessary

Mary P. Marye *v.* John T. Dyche, Gates, Gillespie & Co.

to the existence of a lien." "Therefore, personal property, taken by a *bonâ-fide* mortgagee from the premises by virtue of the mortgage, is not subject to pursuit after removal." Ib. But the same book, Taylor's Landlord and Tenant, elsewhere — namely, in § 612 — says, "Although the tenant may sell or mortgage his fixtures, yet if he does mortgage them, and the mortgagee takes possession, and removes them after they have become liable for the rent, the landlord may yet follow and distrain them within thirty days thereafter;" and *Reynolds* v. *Shuler*, 5 Cow. 323, is cited for this proposition. But it will be observed that this is said of fixtures. But it is said that "if goods are taken in execution after the distress is levied, the landlord may go on and complete his distress." Taylor's Landlord and Tenant, § 599. It is also said that "when goods are seized by the sheriff under an attachment against an absconding debtor, the landlord's right of distress was held not to have been taken away." Taylor's Landlord and Tenant, § 594, citing *Acker* v. *Wetherill*, 4 Hill N. Y. Rep.

It is also stated that " a mortgage of goods is not such a sale of goods as will protect them from distress." Taylor's Landlord and Tenant, § 592.

Section 610 of the same work says that " distrained goods are in the custody of the law, and protected from seizure under an execution." It is here submitted that they should be equally exempt from seizures by sequestration, as asked for in this case.

" As to the goods that may be taken upon a distress for rent, they are, in general, all the movable goods and chattels which may be found upon the premises, whether they be the goods of the tenant, under-tenant, or other person. The necessity of this rule is obvious, when we consider by what varieties of fraud and collusion the rights of a landlord are liable to be defeated, if he is to be restricted to such goods only as he can prove to be the property of the tenant." This passage is extracted from § 583 of Taylor's Landlord and Tenant, and is based upon numerous authorities there cited from both English and American reports.

It was, however, argued in the court below, that the remedy

by distress for rent was altogether abolished by the State of Mississippi, and that in its place was an attachment for rent created purely by the statute, and capable of no enlargement or explanation by reference to the rules of the common law governing the landlord's right to his distress. On this ground it was contended that the only property that could be taken was that mentioned in the first section of the act in the Revised Code on Landlord and Tenant, as liable to distress, and this was only the tenant's property. It was hence inferred that only the tenant's property could be taken, and that this could only be taken by the landlord under the first section of the statute in question. But this view of the law is wholly inconsistent with the authorities. Our statutes are almost exact copies of the English statutes on the subject of distress for rent. The same statutes are generally followed in those States where this remedy has been preserved. In some States, as for instance lately in New York, all proceedings by distress for rent have been abolished, " as an invidious distinction in favor of a particular class of creditors, which has survived similar remedies applicable to other debts, sometimes operating unjustly towards other classes of creditors who are equally entitled to protection." Taylor's Landlord and Tenant, § 557, is the authority for this statement; and in the same section it states that Mississippi has abolished this remedy by statute, and it was this passage that was made the basis of the argument above stated. It is perfectly manifest, however, that Taylor has been misled with regard to the purport of the Mississippi statutes, by some unreliable authority quoted by him, as " *Griff. Law Reg.* 697." It is plain from his text that he does not consider statutes such as ours to be statutes in abolition of the remedy by distress for rent. " In modern times," says he, § 557, " the whole policy of the law respecting distresses has been changed, and a distress for rent is now no more than a summary remedy for seizing and selling the tenant's property to satisfy the rent which he owes." The argument in the court below was, that the distress for rent was merely the right of the landlord, without the intervention of an officer, to take the goods of his tenant and hold them without

sale until the rent was paid, and that this alone was the remedy by distress which was capable of being levied on goods on the premises not the property of the tenant. Taylor's Landlord and Tenant shows in every section that the remedy known in Mississippi under our statutes, which is the remedy now known in England under her statutes, is the remedy by distress. "At common law, a distress might be levied by the landlord, or any private person authorized by him for that purpose, although he could not sell the property so distrained; but the English as well as the American statutes regulating distresses now require, as a check to abuse in the exercise of this right, that the proceeding shall be conducted by a legal officer." Taylor's Landlord and Tenant, § 579. "The English statutes, from the days of Magna Charta to the present time, have regulated, and in some instances extended, its provisions to meet the exigencies of the times. Our State legislatures adopted and sometimes modified the English statutes, recognizing them as a salutary and necessary remedy, equally conducive to the security of the landlord and the welfare of society." Taylor's Landlord and Tenant, § 556. Our own statutes declare, in art. 12 of the same section, which says the property of the tenant may be taken by distress, that no other person's property can be so taken; and this shows that but for this provision our statutory remedy would have run against all the property on the demised premises, as it did at common law. But the complainants in this bill cannot avail themselves of this provision to claim their property, because this article forbids their taking the benefit thereof, except by a writ of replevin, and this they have not resorted to. They could only have obtained this writ under this article by giving bond in double the amount of the whole rent due, and not simply in double the value of the property; on which bond, if they had failed to sustain their claim to the property, they would have had a judgment entered against them for double the amount of the rent due. This severe penalty is exacted to prevent "those varieties of fraud and collusion" whereby "the rights of a landlord are liable to be defeated, if he is to be restricted to such goods only as he can

prove to be the property of the tenant." Taylor's Landlord and Tenant, § 583.

· The court should, and the law does, therefore cut claimants off from this remedy in chancery, by sequestration for the recovery of property taken by a landlord for his rent under a distress warrant. Indeed, the article of our Code giving the claimant his writ of replevin denies him the benefit of any provision of that whole section, unless he resorts to replevin, with the heavy penalties it involves in case of his failure. And the first article of the act on landlord and tenant being in the same section, the claimant cannot be allowed to read that article to the court to show that a distress warrant can only be levied on the tenant's own goods. He cannot read it in this proceeding, because the statute wisely requires that he shall take his writ of replevin in order to get the benefit of article 1, or of any other provision of section 1. This proceeding in chancery for the recovery of a claimant's property, if allowable, would wholly paralyze the law, which by such severe penal provisions protects the landlord from fraudulent and collusive claims set up to embarrass his collection of his rent. No case can more strongly illustrate this truth than the case at bar. The claimant here, if he had pursued the law, would have been required to give a bond in double the value of the rent,—that is, in $7200; and in case he failed to establish his claim to the five mules and wagon described in his bill, the landlord could have taken a judgment against him and his securities for the whole sum of $7200. This is severe, but it is less severe by far than the law was before it was thus established; for formerly the claimant had no remedy whatsoever to save his property which was taken on the demised premises for rent. "As to the goods that may be taken upon a distress for rent, they are in general all the movable goods and chattels which may be found upon the premises, whether they be the goods of the tenant, under-tenant, or other person." Taylor's Land. and Ten., § 583. So that when hard conditions are imposed on claimants, as the accompaniment of the exemption of their property from distress for rent due from other persons, the hardship cannot justify a

court in setting aside the conditions which are thus established by law. But to allow a claimant to proceed in equity to assert his rights would be to set aside the conditions which the law heretofore stated imposes upon him in asserting them; for a court of equity will not enforce the penal provisions of the statute, and in case the claim is found to be unsustained, the court of chancery will not render a decree in favor of the landlord for double the rent, though the statute declares this is what he shall have. Nor will the court of equity exact a bond of the claimant with the securities and in the penalty to which the landlord is entitled, by the act on landlord and tenant, to hold the claimant. The bond required by the court in the case at bar was only for *three hundred dollars*, while by law the landlord had a right to demand that the claimant should give bond for the payment of $7200, in case he failed to make his claim good. Thus it will be seen that this proceeding takes away all the landlord's safeguards, and exposes him to great varieties of fraud and collusion, and enables the claimant to paralyze the law for the collection of rents, without laying him under the peril of any penalties therefor. I conclude, therefore, that this proceeding is not legal, and cannot be maintained, and that this bill is unquestionably demurrable so far as it demands a restoration of the mules and wagon to the claimant, John T. Dyche. As regards his rights and the rights of Gates Gillespie & Co., as mortgagees, I submit that *Canterbury* v. *Jordan*, 5 Cushman, 96, and the numberless authorities heretofore cited, sufficiently establish that the landlord must be paid his rent before mortgagees can be paid, if the property is seized while it lies on the premises. Those authorities show that a landlord is considered as having a possessory lien on the property as long as it remains on the premises, and the tenant's possession being deemed in law the possession of the landlord, this view of the landlord's rights is in strict accordance both with the legal theory of the relation of landlord and tenant and with the theory of liens arising from possession, such as a mechanic's lien on goods in his hands for the work he has done on them. The moment the possession is lost the lien ceases.

Accordingly, we find that though "a mortgage of goods is not such a sale as will protect them from distress" (Taylor's Land. and Ten., § 592), yet "personal property taken by a *bonâ-fide* purchaser from the premises, by virtue of the mortgage, is not subject to pursuit after removal," for "rent is a lien upon the demised premises, and at common law the right was gone the moment they were removed, for the landlord had parted with his lien; possession, or what is equivalent to possession, being necessary to the existence of a lien." Taylor's Land. and Ten., § 577.

"This statute, which gives him (the landlord) a right to follow them after their removal, does not continue such lien after the removal; it simply provides an additional remedy, without creating a new lien upon the goods." Ib.

The goods in this case were all upon the premises, as appears from the bill, when they were distrained for rent, and they are protected for the landlord against these mortgages by exactly the circumstances to which these authorities all refer. The possessory lien arising by construction from the fact that the goods were on the demised premises, prevails over all other incumbrances. The bill does not show that there were goods enough to satisfy the rent, and the only reliance of the bill is on the prior right of the mortgagees over the landlord. The general law, and the law of Mississippi, as interpreted in the case of *Canterbury v. Jordan,* establish the contrary, namely, that the landlord's rents are the first claim. There is a case of *Prewett* v. *Dobbs*, 13 S. & M. 431, which speaks of a landlord's rights to sell an equity of redemption, and the mortgagee's rights to enforce his claim for payment out of the property in the purchaser's hands; but in this case there was no denial of the prior rights of the mortgagee to payment, he having taken his mortgage on the property before it ever went on the demised premises, and consequently having a property in the goods which qualified the tenant's property before the relation of landlord and tenant arose. In that case the question was, first, whether the mortgagee was a purchaser or a mortgagee, and it being decided that he was a mortgagee, it was next made a

question whether the tenant's equity of redemption was liable to be distrained for rent; and it was held to be so liable. This case does not militate against the general doctrine, that the landlord has a claim for the rent superior to any a mortgagee can acquire; for that doctrine, of course, proceeds on the idea of a mortgage being executed after the goods were on the place, as was the fact in the case at bar. In such a case as this at bar, the only ground of equitable relief would be, that there was money enough to be made out of the property distrained, first to pay the rent, and then to pay the mortgages. But this fact being the ground of relief must be shown by the bill. The bill of complainants, however, shows no such fact; it does not state such to be the fact. It plainly leaves it to be inferred that the property distrained is not more than enough to pay the rent, and thus it leaves complainants without any equity on which to ask the interference of a Court of Chancery. It was said in the court below that the Agricultural Act provided this remedy by sequestration for the collection of agricultural mortgages. But § 8 of that law (Pamphlet Acts of 1867, pp. 569–572) says that "nothing in this act contained shall affect any of the rights or remedies now allowed by law of the landlord for rents due or owing for any plantation or farm." And one of the rights of every landlord then, and still allowed by law, is that set forth in the 288th article of the Revised Code, p. 531, as follows: "No goods or chattels, lying or being in or upon any messuage, lands, or tenements, leased for life, years, at will, or otherwise, shall at any time be liable to be taken by virtue of any writ of execution *or other process whatever*, unless the *party* so taking the same shall, before the removal of the goods off such premises, pay or tender to the landlord or lessor thereof all money due for the rent of the said premises at the time of taking such goods and chattels in execution, whether the day of payment by the terms of the lease shall have come or not, provided the money due shall not amount to more than one year's rent; and if more be due, then the party suing out such execution, paying or tendering to such landlord or lessor one year's rent, may proceed to execute his judgment; and the officer levying the

same is hereby empowered to levy and pay to the plaintiff as well the money so paid for rent as the execution money." This statute is preserved in full force by the terms of the Agricultural Act quoted above, and yet it violates the act in the Code to arrest the sale and seize the property distrained without first paying the landlord, as the Code requires, his year's rent. It will be observed that the Code provides for the payment of this money to the landlord by the "*party*" obtaining the writ. This bill does not show that such has been done. On the contrary, it shows that the property is to be wrested from the landlord's hands in derogation of his rights.

The act to amend the exemption laws of this State, passed in 1865 (Pamphlet Acts, p. 139), declares in the sixth section thereof that a landlord's rights are a lien on the tenant's goods, or at least on his crop raised on the demised lands. Except as this exemption law changes the rule, the landlord had the same right against the other chattels of the tenant as he had against the crop. But this exemption law does not change the rule, except for the benefit of persons entitled to the exemption. The lien of a landlord for his rent, in view of the general authorities, confirmed as they are by this declaration in the Act of 1865, and by art. 288 of the Code above set out, must be recognized as part of the landlord's rights, which § 8 of the Agricultural Act declared that act should not affect. This section would protect the landlord's priority, both as to the crop and the other property, against the complainant's mortgages. But certainly there is every reason to say his prior right to the crop is indisputable; and as I have already shown that the mules and wagon cannot be claimed in this proceeding, the argument covers the whole ground of the bill. The statements in the bill, if true with regard to the mules and wagon, would make them the property of complainant, John T. Dyche, but that being so, he has no right to this remedy to recover them, and the court is bound to hold on this demurrer, first, that as the bill declares the mules and wagon are John T. Dyche's, but that his proper remedy was by a writ of replevin on a $7200 bond, and as to these mules and wagon the bill should be dismissed; and then as to

the crop, the only remaining property distrained, and the only remaining property sued for in the case at bar, the bill must be dismissed, because there does not appear to be enough property to pay the rent, and the landlord ought to be paid first.

"The whole fruits, as *pars soli*, belonged to the landlord while growing upon the land. As the nature of leases gradually changed, and their value to the tenants increased, the products of the soil came to be considered the property of the tenant; but the landlord's property in them to the extent of his rent continued inviolable, and to this limited extent he was still considered proprietor. He therefore continued to levy his rents by his own authority; for no man needed the authority of a judge to lay hold of his own goods, and it made no difference whether rents were payable in money or in kind." Lord Kaimes' Law Tracts, No. 4.

"The proceeding (by distress) is said by Lord Chief Baron Gilbert to have been derived from the civil law." Gilbert on Rents, 3, 26, 92.

"It is certainly a remedy of very high antiquity, and is known to have prevailed among the Gothic nations of Europe immediately after the breaking up of the Roman Empire, and from them was probably carried into England." Taylor's Land. and Ten., § 556; Spelman's Gloss. Parcus.

Mr. Chancellor Kent says,—

"The contract for rent and the remedy of distress are in constant use and application, and in our cities and large towns there are few branches of the law that affect more sensibly every class of people. The law may be deemed rather prompt and strict with respect to the interests of the landlord; but it is a necessary provision, and one dictated by sound policy. It is best for the tenant that he should feel the constant necessity of the early and punctual performance of his contract. It stimulates to industry, economy, temperance, and wakeful vigilance; and it would tend to check the prosperity and growth of our cities if the law did not afford to landlords a speedy and effectual security for their rents, against the negligence, extravagance, and frauds of tenants. It is that security which encourages

moneyed men to employ their capital in useful and elegant improvements; and if they were driven in every case to the slow process of a suit at law for their rent, it would lead to vexatious and countless lawsuits, and be in many respects detrimental to the public welfare." 3 Kent's Com. 485.

Such reflections ought to prevent a Chancery Court from allowing its process to be perverted to improper and unlawful uses, to the destruction of the landlord's lien and distress warrant. Such would be the case if the law for a third person's claiming his property could be avoided and all its penalties escaped by a resort to chancery, as has been done in this bill; and if the distress could be taken from the landlord when it is not sufficient for his payment, as appears to be the fact in the case at bar.

*J. Z. George* for appellees.

1. A landlord has no lien on the goods of the tenant for payment of rent.

At common law there were three kinds of rent, viz.: rent-service, rent-charge, and rent-seck. Of these only one, the first kind, was the right of distress allowed.

Originally, the tenant held his land by the feudal tenures, as a military subordinate of the lord. As a condition of the grant, the tenant was required to render certain military duties to his lord, and he owed him fealty, and was bound to defend his lord's person and property against all enemies.

Afterwards these services were commuted, except fealty, for a pecuniary or other charge, and this charge was called rent-service. The tenant, however, still owed fealty, which was a corporal service, to the lord, so long as the lord was owner of the reversion; and as an incitement to this, the lord was entitled to distrain for rent, and it was called rent-service. This judicial function of deciding in one's own cause, and executing the judgment, was usurped by the lord, in virtue of his being originally the lord paramount of his demesne, and by the feudal law entitled to hold courts and decide causes among his tenants. For it must be remembered that the distress for rent at

common law was a mere private seizure by the lord or his steward of the tenant's goods, and a holding thereof as a pledge until the rent was paid.

There being no such thing as fealty to the lord here, nor no inherent judicial power in any one to decide his own cause, there is and can be no such thing as rent-service here; and hence, if we had no statute in force here allowing a distress for rent, there could be none. See Taylor, Landlord and Tenant, chap. 13, § 2; Gilbert on Distress, p. 586.

It has been settled that the English statutes are not in force in this State. They were expressly repealed, or declared inoperative, in 1808. See Toulmin's Digest; Hutch. Dig., chap. 2, p. 65.

It follows here that the landlord's right of distress is regulated entirely by our statute. Unless this gives him a lien, he has no lien — he has none.

It will be well to note some of the differences between the common law and statute on this subject.

The right of distress at common law was essentially different from the right of distress under our statute.

1. Distress at common law was a private extrajudicial remedy. It was made by the landlord himself or by his agent.

By statute it is a judicial proceeding. The warrant is only issued on affidavit, and is directed to the sheriff or constable to execute, and not to private parties.

2. At common law the distress was delivered merely as a pledge. It could not be sold, and unless the tenant saw proper to redeem it, could not be converted into money. And it was a substitute for forfeiture.

3. At common law, distress could only be made during the term; after its expiration it was gone. It is different by statute.

4. But the greatest and most essential difference, as far as respects the question at issue here, is as to the liability of the property to distress.

At common law, all goods and chattels on the demised premises, whether the property of the tenant or a stranger, were liable to distress. The locality of the property, not its ownership,

was made the test of its liability to distress. If the tenant's goods were removed, they were not liable, unless they were discovered, *eundo*, during the removal, and fresh pursuit made; they were then liable, on the ground that the removal was not complete.

By statute, the title and ownership of the property by the tenant makes them liable to distress.

1. Art. 1, p. 339, requires the attachment to be issued against the goods and chattels of the *tenant generally*, without reference to their locality, but with the right to levy alone on goods on the demised premises, or removed in thirty days.

2. He may distrain for rent goods after their removal, and within thirty days. Art. 5.

3. Art. 12 expressly exempts from distress goods found on the premises in which the tenant has no interest.

The two things, therefore, are radically different. Only the property or interest of the tenant can be distrained.

The statute nowhere declares that the landlord shall have a lien. Nor does it result from any of its provisions.

A lien is defined to be neither *jus in re*, nor *jus ad rem* — a right in the property, nor a right to the property; but is simply a right to possess and retain property until some charge attaching to it is paid or discharged. 1 Story Eq., § 506.

Possession is necessary to a lien. Cross on Lien, p. 36. A mere equitable interest will not do. Ib. A right of possession is part of the essence of a lien, and the lien depends upon the possession. Ib. 53. The right is personal. Ib. 48. Without possession there can be no lien. A lien is a right to hold, and how can that be held which was never possessed? See Lord Ellenborough, in *Heywood* v. *Waring*, 4 Campbell's Rep. 295.

There being no express provisions of our statute declaring that the landlord shall have a lien, it results he has no lien, unless there be such provisions in it as give him rights which would constitute a lien at common law. Tested by the above rules, it is clear he has no lien; for he has no right to possession, and no possession, but merely a right, under certain circumstan-

ces, to apply to a judicial officer for a writ which can be levied on certain property of the tenant; exactly as an ordinary creditor, under certain other circumstances, has a right to apply for and obtain a writ of attachment which can be levied on certain other property of the tenant.

When the attachment for rent is issued, it commands the seizure and disposition of the property by a judicial officer. It does not invest the landlord with possession nor the right of possession, and if it did, the lien would commence with the seizure, and not before.

But this warrant only gives the right to seize certain property. The test of the right to seize depends upon the *ownership* of *the property*, not upon its locality, as at common law.

The command of the writ is to seize the goods, etc., of the tenant, and it is expressly decided that no other person's right or property shall be molested. Art. 12. Like any other execution, it authorizes the seizure of the debtor's goods, and not the seizure of other people's.

And when the seizure is made, only the interest and right of the debtor can be subjected. This is a radical change of the common law.

At common law any property was liable if found on the demised premises; here, only property belonging to the tenant, and only his limited interest therein, can be seized.

Now what right had this tenant when the seizure took place? Simply this — a right to what remained after paying our debt.

The statute provided expressly that we should have a prior lien, and that this gave us the right to seize the property. See Act, 1866 and 1867, 569–71.

Gates & Gillespie were also mortgagees. That made them the real owners of the property.

How then, since title and interest in the property is the test of its liability to be seized, can the attachment for rent lie?

But it may be argued that the eighth section of the act subordinates our lien to the landlord's. That section says that

the rights and remedies *now allowed* by law to landlords shall not be affected by its provisions. But I have just shown that the rights and remedies (*now*) allowed by law only extended to the seizure of *the goods of the* tenant and his interest in them. To give this section any adverse effect upon our rights, it must be construed to mean, that new and additional rights and remedies are given to the landlord — that is, to seize other people's goods — for his rent.

But art. 288, Revised Code, p. 531, is relied on to establish the lien in the landlord's right.

This article must be construed together with art. 12, p. 342, or else it would be held to give the landlord a right, in express opposition not only to same article 12, but to the whole spirit of the distress law, viz., to seize the goods of a stranger for his rent.

Art. 288, then, means this, that no goods or chattels of the tenant lying or being on the premises shall be taken by execution, unless a year's rent be paid.

To give it this construction, would give the power to an insolvent or fraudulent debtor, against whom there is a judgment, to find an asylum for his goods, by placing them on demised premises, on which he was not tenant, and for which there was a large rent due, and there was but little of the tenant's goods to be seized. This would operate as a complete bar to seizure, since the creditor would not be likely to pay a large rent due by another party to secure goods of less value.

The statute evidently meant to secure the goods of the tenant on the demised premises from seizure and sale until the rent was paid, and not to prevent the seizure of other people's goods on the demised premises, nor cut out any right which other people had to the goods by contract.

But it is said we have lost our right by our failure to sue out replevin, and that chancery has no jurisdiction.

The answer is, that we had no legal title nor right to possession under the mortgage till 25th December, and the seizure was made under the attachment on 16th December. That un-

der the supplementary *lien law*, we had only an equity, while that law expressly stated we could enforce only by bill in equity.

The Chancery Court has a constitutional jurisdiction, and has all the jurisdiction of an equity character possessed by the English Chancery Court.

It has been fully settled, from the early Howard Reports up to now, that the jurisdiction thus conferred by the constitution on any of the courts could not be taken away by the legislature.

Chancery was the appropriate tribunal.

It has also been frequently held, that the jurisdiction properly belonging to one of these courts could not be conferred on another.

The legislature could not confer on the Circuit Court equity jurisdiction. *Stewart* v. *Morrison*, 38 Miss. 47; *Ex parte Atkinson*, 40 id. 17.

But it is also said that at all events Dyche cannot recover the five mules which he alleges that he loaned these parties.

But it must be noted that Dyche also states that he invoiced the mules to the defendants, and that it is a matter of doubt under the circumstances whether the title passed. If the title passed, then he claimed under the lien. There is no rule more fully established than that a court of equity will take jurisdiction when complainant's remedy is doubtful at law.

It was argued that the proviso in art. 5, p. 340, showed that the legislature intended that a change of title should only be recognized as against the landlord's right of distress when there was a change of possession and locality. This is a very erroneous view.

Arts. 12 and 1 both show that the statute authorizes the goods of the tenant *only* to be attached, and other parts of the statute show that these goods of the tenant could only be attached whilst on the demised premises. A great change had been made in the common law, in making the ownership of the goods, and *not* their locality, the test of liability to attachment. Still the legislature was unwilling to extend this invidious distinction in favor of landlords, so as to give them the right to at-

tach the goods of the tenant wherever found, and had then restricted the right to such goods as were found on the demised premises.   But it was seen that if the mere passage of the goods beyond the boundary line should operate to defeat their liability to attachment, that it would give the greatest facility to a fraudulent tenant to defeat the remedy by a removal; hence it was enacted in art. 5, that in case of removal the landlord should have the right to attach them wherever found.   The proviso is, that no goods so carried off, and sold in good faith for value, shall be attached.   The object plainly was to make clear and certain, with reference to goods removed, the rule which had been established everywhere else in the statute — that if, when attached, they were not the goods of the tenant, they should not be liable.   This proviso was probably unnecessary and seems to have been introduced out of caution, to prevent a misconstruction of the article.   When rightly understood, therefore, it aids us in understanding the legislative intent, which is, that only the interest of the tenant in the goods could be attached.

A distress for rent being only allowable at common law, in case of rent-service, where fealty is due from the tenant to the lord, and there being no such rent as rent-service here, it is clear that if there were no statute in this State allowing attachments or distresses for rent, that the landlord would have no other remedy to collect his debt for rent than is extended to other creditors, and hence that whatever rights he has, he must derive them from the statute.

The statute in all its provisions proceeds on the idea that nothing but the interest and title of the tenant in the goods shall be attached.   But the argument of counsel for appellant is based upon the idea that the statute means, that if there has been a change in the title or ownership of the goods since the commencement of the tenancy, whereby the title or interest of the tenant has either been wholly lost or qualified and limited, that they are still liable as the absolute property of the tenant.

A casual examination even of the statute will show this idea to be utterly unfounded.   Art. 12, p. 342, says, " No goods or

chattels *found* or being on the demised premises, and *not be-
longing* to the tenant, etc., shall be liable to be distrained for
the said rent; but if the tenant . . . have a limited property or
interest in the goods or chattels, the same shall be liable to be
distrained and sold, for the property or interest of the tenant
may have therein."

This statute either speaks of the time when the distress is
levied, or of a past or future time. If it be asserted that it
speaks of such past or future time, then the time is indefinite
and infinite, as past or to come, since there are no words used in
the context to limit it. But its grammatical construction as
well as its obvious sense is the *time when* the distress warrant
is proposed to be levied. The statute says, goods "found or
being" on the demised premises. Found by whom? Evidently
by the officer making the distress. "Being" is the present
participle, and refers grammatically to the present time. It is
also said of the tenant, *have* (not *had*) a limited property.
Such interest *as he may have* (not may have had) shall be lia-
ble, etc.

This clearly refers to the time when the attachment is levied.
For if it refers to any interest which he may have formerly had,
then, as before suggested, it makes liable any property which
the tenant may have had at *any future time*, indefinite in ex-
tent, in the goods; which would be absurd, and contrary to the
whole spirit and object of the statute. Art. 1 directs the at-
tachment to be issued against the "goods and chattels of the
tenant," which is the same as if it said "against the goods and
chattels which belong to the tenant." And this shows conclu-
sively, what was else quite clear, that the statute authorizes
only the *present* (when the distress is levied) interest or prop-
erty of the tenant to be attached.

There is no escape from this, unless it can be shown that the
law is, that when goods have *once* occupied, or been in that
*condition* which made them *whilst in that condition* sub-
ject and liable to distress, a change in that condition will
not affect or change the liability to distress. But the authori-
ties read by the counsel for appellant conclusively show that

when that condition of the goods and chattels which *made* them liable to distress is changed, the liability is changed and lost. At common law and in England the condition of the goods which made them liable was their being on the demised premises *when* the distress was made, without reference to the title and ownership of the tenant; and hence the authorities referred to by appellant logically held, that whilst that condition (locality) which determined and fixed their liability remained unchanged, no change in their condition in other respects affected their liability to be distrained. Here, by our statute, goods not occupying the condition of being the property of the tenant are not liable. That they should occupy that condition, is essential to their liability to distress. And hence, if a change in the one instance changes the liability, it does so in the other.

Is there anything in the statute which changes this rule? I have already shown that the statute subjects to distress only the present interest or property of the goods. The *jus disponendi* is an incident to ownership. The spirit and genius of our laws favor the free and unrestricted alienation of property. The right exists in all cases where the owner is *sui juris*, unless there be some positive law forbidding it. There is nothing in the relation of tenancy which so ties up the hands of the tenant, as respects his landlord, as to deprive him of the power of aliening his property, or changing that condition of it which makes it liable to the landlord's distress. Even in England, where the rights of the landlord for feudal reasons are carried to an extent not known in other countries, the tenant may, by his voluntary act, change that condition of his goods which makes them liable to distress. He is authorized by law to remove them, and this removal, as effectually as alienation here, defeats the landlord's right.

By ownership and title I mean any interest, absolute or qualified, of the tenant, which makes the goods liable to distress.

Some confusion has arisen from the fact that the statute restricts the right to distrain to the goods of the tenant on the demised premises. It will be observed that the title and owner-

ship of the tenant are essential, but that locality is annexed to the title ; so that in determining the liability of goods to distress we must ascertain that they are the goods of the tenant ; next that they are on the demised premises : both are essential, and if either fail, the right is gone.

The counsel mistakes the argument on this point, viz. : We did not insist that the reason of the law ceasing, the law itself ceases, though it is generally true. The argument was, that the right of distress being incident to rent-service alone, and denied to all others, and that rent-service, including the idea of fealty, never did and never could exist here, therefore there could be no distress here without the statute, and as the landlord has to resort to the statute for this right, he must also look to the statute for his rights.

But the counsel argues that the statute gives the right of distress, and therefore makes all rents rent-service ; that is, if he means anything, makes them all have the incidents of fealty, etc. The true position is, that the legislature found no right of distress in existence, yet were willing to grant the landlord a summary remedy to collect his rent ; granted him a judicial remedy — by attachment (not the private right to seize for himself)—and specified the means and the extent of its existence. This remedy is granted in all cases of rent. The effect of this is not to change the nature of the rent, but to annex to all kinds of rent a certain salutary remedy.

Locality is not abolished by our statute, but it does not determine the liability of the goods. The goods must belong to the tenant ; the warrant is issued against the goods of the tenant, but not against all his goods, — only against those on the demised premises. This, with another incident annexed, art. 12, expressly saying that locality will not fix liability, but the title must co-exist. But in England, at common law, *locality alone determined* the liability. Hence the difference.

But after all, if the English decisions establish a lien, they only establish that *the lien continues* so long as that condition of the goods remains *which fixed* their liability to distress ; and that as soon as that condition is changed, the lien is lost. Here

24

the title is essential — accompanied by locality. Both must co-exist to constitute the liability. Locality alone will not do. *It is worth nothing without title.* Hence, when *the title is gone — that condition of the goods which makes* them liable for distress — *title accompanied by locality is gone;* the lien, if there be any, at common law, is also gone.

But there is no lien here, in the sense that the landlord's right is superior to the claim of a *bonâ-fide purchaser.* The right of the landlord under our statute is a mere privilege, under certain circumstances, to sue out a warrant and have levied on the goods of the tenant then belonging to him.

The ordinary statute on attachments allows the sale of perishable property before judgment and before verdict of a jury; in that case there is no lien until there is a levy, just as in case of attachment for rent.

*James Somerville* for Gates, Gillespie & Co.

The question properly presented in this cause is as to *priority* of liens.

Can the landlord attach for rent the crops and personalty previously mortgaged, in good faith, for money loaned at the date of the mortgage? Is his attachment lien paramount to the rights of the mortgagee?

I maintain the negative of the proposition.

The facts are briefly these: Wadlington & Dyche, in May, 1867, executed a mortgage to Gates, Gillespie & Co., upon their crops of every species then planted, and the mules and stock, to secure the grantees in an advance of $3500, then made, to enable Wadlington & Dyche to cultivate their plantation. If the mortgagors failed to pay the debt by the 1st of December, 1867, then Gates, Gillespie & Co. were empowered to take possession of the property, sell it, and apply the proceeds to the claim thus secured.

This mortgage was recorded in September, 1867, in the office of the Clerk of the Probate Court of Sunflower county, and enrolled in the office of the Clerk of the Circuit Court.

On the 16th day of December, 1867, Mrs. Marye, the lessor

of Wadlington & Dyche, sued out an attachment for rent, which was levied on the cotton, corn, mules, and other personalty found on the place, being the same property conveyed to Gates, Gillespie & Co. in May, 1867. The mortgagees, uniting with John T. Dyche, who is a creditor with a lien for supplies furnished the tenants, under an "Act for the encouragement of Agriculture," approved February 18, 1867, enjoined the sale, and asserted their prior liens.

Among common creditors, he who has the oldest lien has the preference, it being a maxim both of law and equity, *qui prior est tempore, prior est jure.* This maxim may well be invoked by the appellees as conclusive, unless by the laws of this State there be some priority given the landlord over all creditors of every class, and *bonâ-fide* purchasers.

The rights and remedies of landlords, as they were defined in the ancient law, are not adapted to the exigencies of the present age, and have been greatly modified by modern legislation.

The great and peculiar remedy by distress, derived from the Gothic nations of Europe, and immemorially known to the common law, had its foundation in a period when the tenants were bondmen — themselves the property of the landlord, and incapable of holding any property of their own. The soil, its products, tenant — all were the property of the nobles, the only landed proprietors.

When the thraldom of serfs ceased, and the products of the soil became the property of the tenant, still, to the extent of his rent, the landlord was considered proprietor. He levied his rents by his own authority, simply by taking possession of any chattels found on the demised premises, and holding them as a pledge for its payment; for, says Lord Kaimes, "no man needed the authority of a judge to lay hold of his own goods, and it made no difference whether rents were payable in money or in kind."

But in modern times the whole policy of the law respecting distress has been changed, and in those States where the remedy is still retained, a distress for rent is now no more than a sum-

mary method of seizing and selling the tenant's property, to satisfy the rent which he owes.

" The State legislatures seem now to be gradually abolishing this ancient remedy, as giving an undue advantage to landlords over other creditors in the collection of their debts." Taylor's Landlord and Tenant, § 556.

" In the New England States, the law of attachment on mesne process has superseded the law of distress for rent. . . The State of New York has abolished this remedy, regarding it as an invidious distinction. The courts of North Carolina hold it to be inconsistent with the spirit of her laws and government. . . . . . Mississippi has abolished it by statute, but property shall not be taken in execution on the premises, unless a year's rent, if it be due, shall be first tendered to the landlord." Taylor's Landlord and Tenant, § 558 ; Griff. Law Reg. 697.

" The right of distress does not exist in Alabama, *Mississippi*, North Carolina, nor the New England States." Bacon's Abridg., title Distress, note ; 1 Hilliard Abr. 156.

The opinions cited above show the construction placed upon the statutes of this State, in relation to landlord and tenant, by those eminent text-writers and annotators, and will weigh with this court as persuasive arguments to support the view taken by counsel for appellees. We contend that the common-law remedy of distress has been wholly abrogated in this State, and that we have in its place a procedure by attachment which cannot be illustrated by the rules of the common law, and is framed to meet the exigencies of the day. The peculiar rights of land-owners are not so paramount, nor their remedies so arbitrary and stringent, as they were once recognized and enforced. By the common law, the landlord had a lien on the chattels of the tenant on the premises ; there is none given by express terms or by implication in our act.

By the common law, the landlord, of his own authority, seized the property and held it as a pledge ; in this State, he must make oath to his debt, and give bond and security to the tenant.

Anciently, the landlord was judge in his own cause, and exe-

cuted his own process; now the courts adjudge his claim, and the sheriff executes the mandate of the courts.

All property found on the demised premises, whether 'that of the tenant or a stranger, was liable for the rent; under our act, attachment is issued " against the goods and chattels of such tenant."

By the common law, the right of the landlord to seize property was determined by the *locality;* in our act, it is limited and determined by the *interest* of the tenant.

The remedy given in art. 1 (Code, p. 339) is termed an *attachment,* and the bond must be the same " as required in cases of attachment against absent debtors."

The peculiar rights of the landlord, then, consist in the power thus given to enforce payment of rent by attachment, with an additional safeguard against judgment creditors, or attaching creditors of the tenant, created by art. 228, p. 531, Code.

By this, it is provided that no goods or chattels (meaning those of the tenant) shall be taken by virtue of any writ of execution or other process, from the leased premises, unless the party so taking them shall pay the amount then due the landlord, if the sum do not exceed one year's rent.

The gist of the whole legislation on this subject is to give the landlord a summary remedy for the rent against the property of the *tenant;* and to protect his claim from being defeated by the seizure and sale of the *property* of the tenant, under execution or other final process.

It does not prohibit or prevent the tenant from selling or disposing of his crops or other property, and expressly protects a *bonâ-fide* purchaser from the tenant before seizure. Art. 5, p. 340.

The whole tenor of the act is inconsistent with the theory of a lien existing in the landlord upon the property of the tenant, except that which arises upon the levy of his attachment. The point has never been directly before this court, but is not altogether new to the courts of this State. In the tenth district it has been ruled by the presiding judge that no such lien exists; and I learn through the press that Judge Smiley has re-

cently decided in Claiborne Circuit Court, in the case of *Gilman* v. *Stamps*, that a landlord has no lien on the crops of his tenant for the rent; and that a *bonâ-fide* sale of the property by the tenant, before the levy of the landlord's attachment, will defeat the attachment.

*Prewett* v. *Dobbs*, 13 S. & M. 431, is believed to be decisive of the very question involved in the case at bar.

Marcum was indebted to Mallet for rent. He had in possession a slave, which was mortgaged to Prewett by him. Mallet sued out an attachment for rent, and distrained the slave. The court decided that the statute provides, "that if the tenant, bound for arrears of rent, shall have a limited property or interest in such goods or chattels which were attached on the premises, the same may be distrained, and *such interest sold;* that equitable rights are not exempt from sale under an attachment for rent. From this it follows that the right of redemption, which existed in Marcum when the slave in controversy was distrained, was liable to be distrained and sold in satisfaction of the rent due by him; and the vendee at the sale would take his right or interest, subject to the legal title of plaintiff." Ib. pp. 442, 443.

Legal subtlety can draw no line of demarcation between that case and the case at bar, so far as it relates to Gates, Gillespie & Co.

Marcum sought to establish the lien of his attachment for rent over the mortgage of Prewett. Mrs. Marye seeks to establish the lien of her attachment, levied on 16th December, over the mortgage of Gates, Gillespie & Co., executed in May, and recorded in September, 1867.

It is evident — the law is so declared — that nothing but the equity of redemption existing in Wadlington & Dyche, the tenants, can be reached by the attachment of the appellant.

Our laws authorize the landlord to attach *only the goods of the tenant,* and he cannot seize that which is vested in third persons, whether the title be derived through the tenant or otherwise. A mortgagee who has parted with his money on the security, is deemed a purchaser *sub modo:* he is so regarded

every day under the statutes respecting fraudulent sales, and is protected within the saving clauses in favor of subsequent purchasers in good faith.   25 Wendell Rep. 398 ;  6 Johns. Ch. Rep. 417 ;  Powell on Mortgages, 281.

In the case of *Frisby* v. *Thayer*, 25 Wend. Rep. 396, where the landlord pursued goods taken from the demised premises by a mortgagee, *Justice Nelson*, delivering the opinion of the court, said : " The ground upon which I place this case is : 1. The mortgage was taken to secure a *bonâ-fide* debt, and was valid as between the parties. 2. It was valid also in respect to the *landlord*, unless fraudulent in fact. 3. The property was not the tenant's when it was removed from the premises ; the statute authorizes the landlord to pursue it within thirty days."

The mortgage in this case was forfeited on the 1st December, 1867, and by its terms Gates, Gillespie & Co. were entitled to take possession of the whole crop and property on the demised premises.

*Canterbury* v. *Jordan*, 27 Miss. 97, relied on by appellant's counsel, does not touch the merits of the present cause, so far as the appellees, Gates, Gillespie & Co., are concerned.   In that case, two attachments, one for rent and the other for an ordinary debt, were levied on the *tenant's property* on the same day, and the court directed the sheriff to sell the property, and apply the proceeds to the payment of the rent debt.

Here the rights of Gates, Gillespie & Co. did not arise under the lien of an execution or other process, mesne or final, but under a *bonâ-fide* conveyance, which vested them with the legal title to the property, anterior to the seizure by the appellant.

Peyton, J., delivered the opinion of the court.

John T. Dyche, Joseph R. Gates, A. J. Gillespie, and D. T. Saffarons filed their bill of complaint in the Chancery Court of the county of Sunflower, against Mary P. Marye, James M. Wadlington, Isaac R. Dyche, and Eli Waites, alleging that the said James M. Wadlington and Isaac Dyche leased from the said Mary P. Marye a plantation situated in said county, for the year 1867, and that they employed on said plantation a consid-

erable number of laborers, and being without sufficient means to carry on said plantation, they had to borrow the same on the credit of the crop to be raised by them.

The complainants further allege in the bill that said Gates, Gillespie, and Saffarons, under firm name and style of Gates, Gillespie & Co., of New Orleans, in the State of Louisiana, advanced money and supplies to the said Wadlington & Dyche to the amount of about $4300, to secure the payment of which they executed a mortgage to the said Gates, Gillespie & Co. on the crop raised on said plantation, which was duly recorded and enrolled in the proper offices in September, 1867.

And that complainant, John T. Dyche, also furnished to said. Wadlington and Isaac Dyche supplies for said plantation to the amount of $4900, or thereabouts, and that to secure the same, on the 3d day of November, 1867, they executed to him their certain promissory note in writing of that date for the sum of $5000, and payable one day after the date thereof, and made the same a lien on the crop, and the mules and other articles purchased with the means thus advanced, under the act of the legislature to encourage agriculture, approved February the 18th, 1867. Which said note operating as a lien as aforesaid, was duly enrolled and filed in the clerk's office of said county on the 12th day of December, 1867.

That the claim of Gates, Gillespie & Co. has been reduced by payments to about $1200, which yet remains due them.

The complainants further state in their bill that on the 16th day of December, 1867, the said Mary P. Marye procured a distress warrant against the property of the said Wadlington & Dyche for rent, to the amount of $3600, and had the same levied on the crop then on said leased premises, to wit, on 1800 bushels of corn and 16 bales of cotton, besides five mules and a wagon, which were on said plantation when the seizure was made. And that said crop was more than sufficient to pay said Gates, Gillespie & Co., and that the balance due them and the claim of John T. Dyche constitute prior liens on said crop to that created by said attachment for rent.

The complainants state that said five mules and wagon levied on for the payment of the rent as aforesaid, are the property of the complainant, John T. Dyche, who, early in the year 1867, loaned the same to the said Wadlington & Dyche, and invoiced the mules to them at about $500, and the wagon at about $100, but with the understanding that the same were not to be their property, and that they were to return the same, or account for such as might be lost or destroyed, at the invoice price. That said mules were furnished to the said Wadlington & Dyche to aid in the cultivation of said plantation and the making of said crop, and were so used by them.

The complainants further state that the said 1800 bushels of corn and 16 bales of cotton, and said mules and wagon, are in the possession of Eli Waites, the sheriff of said county, who holds the same under said attachment for rent. And as to the mules and wagon, they are advised that it is a matter of doubt whether they are the property of said John T. Dyche, or not. Be this, however, as it may, it is insisted that he is still entitled to a lien on the same to pay for his said supplies. And as to the crop made on said plantation, it is insisted that Gates, Gillespie & Co. have a prior right to satisfaction out of it, and then the right of the said John T. Dyche to be paid next attaches. The bill concludes with a prayer for appropriate process and a writ of sequestration, and that upon final hearing complainants' liens may be decreed to be good and valid and preferable to all others as to the crop, and for an account and sale of the property.

To this bill the defendant, Mary P. Marye, demurred, and the demurrer was overruled, and an appeal was taken to this court by the appellant, who assigns for error that the court below erred in overruling the appellant's demurrer to complainants' bill.

The main question presented by this record for our consideration is, Has the landlord a prior right or superior claim to have satisfaction of his debt for rent out of the property of his tenant to that of any other creditor by mortgage, or of one having a specific lien in writing on the property of the tenant

·anterior to the levy of the attachment on the same for rent? This, it must be conceded, is a vexed question, which, for the first time, we believe,· has been presented for the decision of this court.

The common-law process ·of distress does not exist in this State. The whole policy of the law respecting distresses for rent has been changed by our statute, and a distress for that purpose is now no more than a summary method of seizing under a writ of. attachment the tenant's property and selling the same to satisfy the rent which he owes. And the property seized must belong to the tenant. The statute provides that the attachment for rent shall issue against the goods and chattels of the tenant, and the officer is commanded to distrain the same to an amount sufficient to satisfy the rent and costs. Rev. Code, 339, art. 1. But if the tenant have only a limited property or interest in such goods and chattels, the same shall be liable to be distrained and sold for the property or interest such tenant may have therein. Rev. Code, 342, art. 12. It rests upon the general right of the tenant to dispose of his property, which is no more embarrassed on account of rent in arrear than it is by any other description of outstanding debts.

Rent is not *per se* a lien on goods found on the demised premises. It binds as a lien only when the goods are seized under an attachment for rent. In the meantime, he may sell, dispose of,· or incumber the same *bonâ fide* and for valuable consideration, notwithstanding the existence of a debt for rent. The power of alienation by the tenant exists until the goods are seized under an attachment for rent, without any limitation or restriction on account of rent.

The mortgage executed by Wadlington & Dyche and filed for record on the 30th of September, 1867, before the levy of the attachment for rent, gave to the mortgagees, Gates, Gillespie & Co., a prior right to satisfaction of their claim out of the property covered by the mortgage. And the written contract made by Wadlington & Dyche with John T. Dyche, which was filed and enrolled in the clerk's office of the Circuit Court of said county of Sunflower, became a lien under the

statute of 1867, upon the equity of redemption of the property embraced in the mortgage to Gates, Gillespie & Co., except that which is exempt by law from levy and sale under execution; and also on the animals and implements employed in cultivating the plantation, which shall have been purchased with the money advanced by the said John T. Dyche.   Pamphlet Acts, 1867, p. 569.

Gates, Gillespie & Co., and John T. Dyche having specific liens on the property in controversy anterior in point of time to the lien of the attachment for rent, are, in our opinion, entitled to prior satisfaction of their respective claims out of the property, in accordance with the maxim, *qui prior est in tempore, potior est in jure.*

The statute prohibits the judgment creditor of the tenant from taking the goods and chattels on the demised premises by virtue of a writ of execution, unless the party so taking the same shall, before the removal of the goods off such premises, pay or tender to the landlord or lessor thereof all money due for the rent of the said premises at the time of taking such goods and chattels in execution, provided the money due shall not amount to more than one year's rent; and if more be due, then the party suing out such execution, paying or tendering to such landlord or lessor one year's rent, may proceed to execute his judgment.   Rev. Code, 531, art. 288.   This legislation is founded on the idea that the landlord has no common-law lien here for rent, and hence the necessity of this special protection, by statute, of the interest of the landlord to the extent of one year's rent against the general lien of a judgment.   We think this provision of the statute does not affect the tenant's conveyance by mortgage in good faith and for valuable consideration of the property on the demised premises, or where there is a special lien thereon created by contract, prior to the levy of the attachment for rent.

According to the allegations of the bill, the complainant, John T. Dyche, was owner of the five mules and wagon, and had a full, adequate, and complete remedy at law, and had the defendant Mary P. Marye's demurrer been limited to this part

of the bill, it should have been sustained.    But as the demurrer is applied to the whole bill, it cannot be sustained as to this part only.    For it is a general rule, that a demurrer cannot be good as to a part which it covers, and bad as to the rest, and therefore it must stand or fall all. together.    Story's Equity Pleading, 400, § 443.

For these reasons we think the court below did not err in overruling the appellant's demurrer to the bill of complaint.

The decree of the court below will be affirmed, and leave given to answer the bill within sixty days from this time.